SB76646

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

JOHN BRICKER,

      Plaintiff,

    v.

JAMES M. EPSTEIN, individually, and

LAKE FRONT ASSOCIATES LLC,

      Defendants.

Case No. 3:26 cv 1125

FILED – JUL 30, 2026 – PM02:29
US DISTRICT COURT
Northern District of Indiana
Chanda J. Berta – Clerk

### COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff John Bricker, proceeding pro se, brings this action against Defendants James M. Epstein, individually and as alter ego of Lake Front Associates LLC, and Lake Front Associates LLC, for wrongful eviction and ouster, trespass, conversion, fraud in the inducement of a lease, breach of written contract, intentional infliction of emotional distress, tortious interference with business relations and employment, and treble damages under the Indiana Crime Victims Relief Act. In support thereof, Plaintiff states as follows:

### I. THE PARTIES

1.  Plaintiff John Bricker is a natural person domiciled in New Buffalo, Berrien County, Michigan. He resides there, intends to remain there indefinitely, and maintains no domicile in any other state. Plaintiff is therefore a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332. Plaintiff operated a used restaurant and pre-owned medical equipment business from commercial premises in Michigan City, LaPorte County, Indiana, for over fourteen (14) years.

2.  Defendant James M. Epstein is a natural person. Epstein presently resides at Unit 102, The Hill Apartments, 511 N. Notre Dame Avenue, South Bend, St. Joseph County, Indiana

1

46617, an address also reflected in filings made on behalf of Lake Front Associates LLC with the Colorado Secretary of State. Epstein returned to Indiana from Florida approximately six months before the filing of this Complaint, resides in South Bend, and intends to remain there indefinitely. Epstein is therefore domiciled in Indiana and is a citizen of the State of Indiana for purposes of 28 U.S.C. § 1332, that citizenship being determined as of the date this Complaint is filed. Epstein may be served at that address or wherever he may be found.

3. Epstein is not, and at no time relevant to this action has been, a citizen or domiciliary of the State of Michigan. From 2024 until his return to Indiana, Epstein resided in Key West, Florida. Should Epstein contend that he remains domiciled in Florida notwithstanding his present residence in South Bend, complete diversity of citizenship is unaffected: Plaintiff is a citizen of Michigan, and under neither characterization of Epstein's domicile is Epstein a citizen of Michigan.

4. Defendant Lake Front Associates LLC ("the LLC") is a limited liability company. Defendant James M. Epstein is its sole member. The LLC has no other member of any kind, and no member of the LLC is or has ever been a citizen of the State of Michigan. Because a limited liability company takes the citizenship of each of its members, and and because the LLC's sole member is a citizen of Indiana, the LLC is a citizen of the State of Indiana and of no other state. Whatever Epstein's domicile is determined to be, the LLC shares it, and under no determination is the LLC a citizen of Michigan.

5. Plaintiff's allegation as to the LLC's membership is based on the LLC's own public filings with the Indiana and Colorado Secretaries of State; on Epstein's sworn testimony at the damages hearing held June 10, 2026 in the LaPorte County proceeding, in which Epstein testified that he is the president and owner of the LLC; and on Epstein's exclusive control of the LLC's bank account, lease execution, rent collection, and litigation decisions throughout the events described herein. Plaintiff is aware of no other person or entity holding any membership interest in the LLC.

6. The LLC is organized under the laws of the State of Colorado. It obtained a certificate of authority to transact business in Indiana from the Indiana Secretary of State in 2016. Its Indiana registration was administratively revoked on May 5, 2025, and it is presently a

2

delinquent entity in Colorado. Neither the LLC's state of organization nor its administrative status alters its citizenship for diversity purposes, which is determined solely by the citizenship of its members.

7.   The LLC continues to exist notwithstanding its administrative status and remains amenable to suit. Because a limited liability company may not appear in federal court through a non-attorney, the LLC must appear through licensed counsel. Service may be effected upon Epstein as the LLC's sole member and controlling person, or as otherwise permitted by Fed. R. Civ. P. 4.

8.   At all times material to this Complaint, Epstein exercised complete dominion and control over the LLC, commingled his personal finances with LLC finances, closed the LLC's bank account within months of lease execution, failed to maintain the LLC as a separate legal entity, and used the LLC to conceal his personal identity as the true owner and landlord of the Property. The LLC is the alter ego of Epstein, and both are jointly and severally liable for all claims asserted herein.

## II. JURISDICTION AND VENUE

9.   This Court has original subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity of citizenship exists: Plaintiff is a citizen of Michigan; Defendant Epstein is a citizen of Indiana; and Defendant Lake Front Associates LLC is a citizen of Indiana because its sole member, Epstein, is a citizen of Indiana. No Defendant shares citizenship with Plaintiff, and no Defendant is a citizen of Michigan under any characterization of Epstein's domicile.

10.   The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff's commercial inventory alone had a value in excess of $200,000. In addition, Plaintiff seeks the prepaid rental due under the Sale Addendum, recovery of rents paid throughout the tenancy under the fraud and alter ego theories, lost business income, punitive damages, and treble damages under Indiana Code § 34-24-3-1.

11.   No claim asserted in this Complaint arises under federal law, and no claim asks this Court to review, reverse, void, or modify any judgment or order of any Indiana state court.

3

Plaintiff asserts independent tort and contract claims that were never adjudicated in any state forum.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2). The commercial premises at the center of this dispute — 208–210 Freyer Road, Michigan City, Indiana 46360 — are located in LaPorte County, Indiana, within the Northern District of Indiana, South Bend Division. A substantial part of the events and omissions giving rise to this action occurred in this District.

### III. GENERAL FACTUAL ALLEGATIONS

**A. The Property, the LLC, and Epstein's Concealment of Ownership**

13.    On or about June 1, 2023, Plaintiff entered into a written commercial lease for the premises at 210 Freyer Road, Michigan City, Indiana 46360 (the "Property"). The lease was executed in the name of "Lake Front Associates LLC" as lessor. By a Second Addendum executed as part of the same lease, Plaintiff also leased two additional sections of the adjoining building known as 208 Freyer Road, Michigan City, Indiana 46360, which bears that address on its Freyer Road elevation and has its own separate entrance. The Property fronts both Freyer Road and U.S. Highway 12, also designated E. Dunes Highway, and has been referred to in the state court proceedings described below both as 210 Freyer Road and as 3609 E. Dunes Highway. Upon execution of that Second Addendum the rent became $1,100.00 per month for all of the property leased — a single, undivided rent covering both 208 and 210 Freyer Road. Epstein's eviction complaint sought possession of 210 Freyer Road only. No eviction proceeding was ever initiated, and no court order was ever obtained, with respect to 208 Freyer Road until June 6, 2025.

14.    The buildings comprising the Property are physically connected and divided into four sections, each with its own separate entrance. Plaintiff leased 210 Freyer Road under the original lease and two additional sections of 208 Freyer Road under the Second Addendum. A third section was let by Epstein to another tenant. The fourth section is an office space that Epstein converted to an apartment. The lease refers to that space, which Epstein used as his own office and which he thereafter let as a residence. That apartment directly adjoins the portion of

4

208 Freyer Road leased to Plaintiff and was continuously occupied throughout Plaintiff's tenancy and after Plaintiff was locked out. The third and fourth sections were not part of Plaintiff's leasehold.

15.    At all times relevant, Defendant James M. Epstein was the true owner of and party in interest with respect to the Property. Epstein held record title to the Property personally. On January 21, 2025, Epstein personally conveyed title to the Property to Peachtree Partners-Indiana I LLC, and the purchaser has acknowledged in a subsequent judicial proceeding that it acquired title to the Property from James M. Epstein. In the alternative, and to the extent record title stood in the name of Lake Front Associates LLC, the LLC held that title as the nominee and alter ego of Epstein, who alone negotiated and administered the lease, alone directed all litigation concerning the Property, alone decided to sell it, and personally received the benefit of all rents and sale proceeds.

16.    Epstein never disclosed to Plaintiff, at lease execution or at any time thereafter, who the owner of the Property was. At the damages hearing held June 10, 2026, Epstein was asked under oath whether he had ever let Plaintiff know who the owner of the real estate was. Epstein answered by asking why he would have done so, and testified that he did not recall telling Plaintiff whether the owner was himself or the LLC.

17.    The LLC's status as Epstein's alter ego is established by the following facts, among others:

(a)    The LLC exercised no independent judgment or control over the Property; Epstein alone leased it, administered it, litigated over it, and sold it;

(b)    The LLC's bank account was closed within months of the lease being signed, rendering the LLC incapable of performing any financial obligation as landlord;

(c)    Epstein personally negotiated, executed, and administered the lease without meaningful separation between himself and the LLC;

(d)    Epstein had no management contract or other written authority to manage the Property on behalf of the LLC;

5

(e)   The LLC was never adequately capitalized to serve as a commercial landlord;

(f)   Epstein commingled personal and LLC funds from inception; and

(g)   The LLC was administratively revoked by the Indiana Secretary of State on May 5, 2025, for failure to maintain required filings.

18.   Because the LLC is Epstein's alter ego, all rental payments made by Plaintiff to or through the LLC during the tenancy were, in law, payments made to Epstein personally. Plaintiff seeks recovery of those payments as part of the fraud and alter ego claims asserted herein.

19.   The lease contained the following material provisions, among others: (a) Section 14(a) — all notices and demands by the Landlord to the Tenant shall be sent by certified United States mail, postage prepaid; (b) Section 3(b) — all rent payable on the first day of each calendar month, in advance, without notice, demand, deduction or offset; (c) Section 14(b) — an express covenant of quiet possession of the Premises for the entire term; (d) Section 10 — the Landlord's right of entry to inspect, alter, improve or repair, conditioned on the Landlord providing twenty-four hours' notice of any entry request to the Tenant; (e) Section 7 — the Landlord's obligation to maintain the roof, water access to the building, and natural access to the building; (f) Section 11(b) — a monetary default arises only where the Tenant's failure to pay continues for a period of ten days after written notice thereof by the Landlord to the Tenant; (g) Section 12(a) — attorney fees may be requested by a prevailing party only where legal action becomes necessary following agreed-upon proper notices; (h) Section 14(d) — a bilateral prevailing party fee provision; (i) Section 14(c) — an integration clause providing that no provision may be amended or added to except by a writing signed by the parties; and (j) Section 15(b) — an indemnity running to the Landlord only as to claims not arising from the Landlord's own acts, omissions, fault or negligence.

20.   The lease was executed contemporaneously with two written addenda. The First Addendum provided that the lease would run twelve months from June 1, 2023 and thereafter continue month-to-month subject to a sixty-day cancellation by either party for any reason; that upon the sale of the Property or an accepted offer with customary deposit the Landlord could terminate on sixty days' written notice, whereupon rental would cease as of the date of that notice and any prepaid rental would be returned to the Tenant (the "Sale Addendum"); that the

6

Landlord had no active potential buyers at the time of signing; and that the Landlord would give any property buyer the opportunity to continue the Lease with the Tenant. The Second Addendum leased to Plaintiff two additional sections of Building 1 — the building known as 208 Freyer Road — at an additional $400.00 per month, bringing the total rent to $1,100.00 per month, granted Plaintiff an option on the balance of that building for a further $200.00 per month should the adjacent tenant vacate, and applied all conditions of the original lease to the additional space.

21. Epstein executed the lease in two capacities. One Landlord signature block reads "Jim Epstein for Lakefront Associates, LLC." A second Landlord signature block, immediately below it, reads "James Epstein." Epstein thereby bound himself personally to the obligations of the lease, including those of the Sale Addendum, independent of any question of the LLC's liability.

## B. Plaintiff's Business Operations and the Transition from 107 Freyer Road

22. Prior to and concurrent with his tenancy at 210 Freyer Road, Plaintiff operated his used restaurant and pre-owned medical equipment business from a warehouse at 107 Freyer Road, Michigan City, Indiana, where he had been a tenant for approximately fourteen (14) years. Plaintiff was in the process of transitioning his operations and inventory between the two locations at the time of the events described below.

23. As part of that transition, Plaintiff employed workers, some of whom resided in residential rental properties owned by Epstein, and was completing his move-out of 107 Freyer Road using 53-foot semi-trailers. After the eviction complaint was filed, Plaintiff ceased moving property into 208 Freyer Road but continued his lawful move-out obligations at 107 Freyer Road.

## C. The Manufactured Payment Dispute and the Eviction Filing

24. Following execution of the lease, Epstein listed the Property for sale with a realtor and relocated his residence to Key West, Florida. In January 2024, Epstein advised Plaintiff that he would be traveling back to Michigan City and asked Plaintiff to hold the February 2024 rent check. Plaintiff paid rent through an automatic payment system at his bank. The February check

7

had already been processed and mailed so as to arrive before February 1, 2024, and could not be recalled or held. Upon arriving in Michigan City, Epstein stated that he needed an advance, and Plaintiff as a courtesy immediately obtained and delivered a cashier's check. The parties agreed that the bank-issued check then awaiting Epstein's return to Florida would be applied to March 2024 rent.

25.    Consistent with that agreement, the ten-day notice subsequently issued on Epstein's behalf demanded only April 2024 rent and did not demand March 2024 rent.

26.    That ten-day notice was never served on Plaintiff. It was not sent by certified United States mail as Section 14(a) of the lease required. It was instead directed to the 210 Freyer Road building, an unattended warehouse space at which Plaintiff did not regularly receive mail and was not present to receive it. Plaintiff never received it from Epstein, from Epstein's counsel, or by service of any kind.

27.    Under the lease, no monetary default could arise unless and until the Landlord gave the Tenant written notice and the failure to pay continued for ten days thereafter. Section 14(a) required that any notice from the Landlord to the Tenant be sent by certified United States mail. Because no certified-mail notice was ever sent to Plaintiff, the ten-day period under Section 11(b) never began to run and no default under the lease ever matured. Epstein nonetheless caused an eviction complaint to be filed for nonpayment of rent. The state court that heard that complaint later found that neither party had proven whether the disputed payment was received, and awarded possession on a separate non-renewal theory rather than on the nonpayment allegation that was the stated basis for filing.

28.    Plaintiff learned of the notice only by chance. An employee of Plaintiff who was assisting with the relocation of Plaintiff's inventory, and who was also a tenant of Epstein in an adjoining office that Epstein had converted to an apartment, mentioned to Plaintiff that Epstein had arranged a surprise for Plaintiff involving the Sheriff. Plaintiff went immediately to the Sheriff's office and obtained a copy of the ten-day notice from the clerk there. That is the only way Plaintiff ever came to see the notice.

8

29.    Having learned of the notice, Plaintiff acted immediately. He confirmed at his bank that the March 2024 check had not been cashed, obtained cashier's checks for both March and April 2024 rent, and mailed them by certified mail to Epstein's Key West, Florida address together with a letter asking Epstein to follow the terms of the lease. The envelope was delivered and signed for at that address on or about April 22, 2024. Epstein later claimed that the envelope contained only a letter and no checks. That claim is not credible, and Plaintiff will establish at trial that it is false.

30.    On April 24, 2024, at approximately 9:44 a.m., Plaintiff telephoned Epstein's attorney to make arrangements to resolve the matter. The attorney stated that it was his son's birthday and asked to meet the following morning. Plaintiff agreed. Despite that agreement, at approximately 12:27 p.m. the same day — roughly two hours after agreeing to wait, and three days before the cure period expired — that attorney filed an eviction complaint in LaPorte Superior Court on Epstein's specific direction.

31.    Plaintiff was prepared and financially able to issue and deliver a replacement payment at the agreed-upon morning meeting. The filing deliberately foreclosed that opportunity. It also operated to defeat the sixty-day notice and continued-occupancy rights the lease and its First Addendum afforded Plaintiff. The eviction was not filed because rent was genuinely unpaid. It was filed as a financial strategy. Epstein already held a sixty-day cancellation right exercisable for any reason. He did not use it, because terminating on that ground would have obliged him under the Sale Addendum to stop charging rent and to return Plaintiff's prepaid rental upon the anticipated sale. During the parties' negotiations Epstein had made clear that he did not want to return money he characterized as not having been paid on time. A successful nonpayment eviction would let him assert that there was no prepaid rental to return, and would convert him from a party obligated to refund money into a party positioned to claim attorney fees.

## D. Epstein's Coordinated Campaign Against Plaintiff's Business

32.    Following the filing of the eviction complaint, Epstein undertook a coordinated series of deliberate acts designed not merely to recover possession of the Property, but to destroy

9

Plaintiff's business, eliminate Plaintiff's labor supply, deprive Plaintiff of his commercial inventory, and exhaust Plaintiff financially through prolonged litigation.

33. Epstein sent written communications to Plaintiff advising that Epstein's residential tenants — individuals who had been employed by Plaintiff — would no longer be permitted to work for Plaintiff, and communicated to those tenants that their continued tenancy was in jeopardy if they continued to perform work for Plaintiff. At least one worker ceased working for Plaintiff as a result. These communications deprived Plaintiff of needed labor at the precise moment he required workers to move and protect his commercial inventory.

34. An interior doorway connects Plaintiff's leased portion of 208 Freyer Road to the adjoining apartment section Epstein controlled and occupied. Plaintiff blocked that doorway in order to secure his commercial inventory. Epstein opened it. Plaintiff secured it again, and Epstein opened it again, repeatedly. Epstein ultimately posted a written sign at the doorway directing that it remain open at all times for maintenance purposes. Section 10 of the lease permitted Epstein to enter to inspect, alter, improve or repair only upon providing Plaintiff twenty-four hours' notice of an entry request; it gave him no right to require that an interior doorway stand permanently open. From that point forward Plaintiff had no ability to secure his inventory against entry through that doorway.

35. On multiple occasions Epstein also deliberately left exterior doors to both the 208 and 210 Freyer Road premises unsecured and open. The combined effect of the forced-open interior doorway and the unsecured exterior doors was to give unrestricted access to Plaintiff's commercial inventory to a person formerly employed by Plaintiff and to other persons who had no right to be present on the premises. Epstein knew that these persons were not suitable to be given unsupervised access to property of substantial value, and created and maintained that access notwithstanding that knowledge.

36. Epstein was personally present at 208 Freyer Road, together with the individual described in the preceding paragraph, during periods when Plaintiff was locked out of or denied access to the premises. Items of Plaintiff's commercial inventory were removed from the premises during those periods without Plaintiff's knowledge or consent.

37.     Epstein also applied pressure to Plaintiff's landlord at 107 Freyer Road, where Plaintiff had operated for approximately fourteen years, in furtherance of his campaign to eliminate Plaintiff's business relationships and destroy Plaintiff's ability to continue operations.

**E. The July 31, 2024 Lockout, the Stay Orders, and the January 2025 Sale**

38.     On July 31, 2024, Epstein signed a renewal and extension of an earlier purchase agreement with a prospective third-party buyer, conditioned on Plaintiff being removed from the Property by September 30, 2024. On or about that same day, and continuing into August 1, 2024, Epstein caused the Sheriff to assist in locking Plaintiff out of 210 Freyer Road. Contemporaneously — and without any court order, without the presence or authorization of the Sheriff, and without any lawful authority whatsoever — Epstein unilaterally locked Plaintiff out of 208 Freyer Road, premises as to which no eviction proceeding had ever been initiated and no court order had ever been entered.

39.     At the time of the lockout, Plaintiff was mid-move. Three semi-trailers had been loaded; five or more remained to be filled. Plaintiff's entire commercial inventory — valued in excess of $200,000 — remained inside the premises when Epstein completed the lockout.

40.     Among the equipment trapped inside were multiple units of commercial beverage equipment containing water-filled holding tanks. Such equipment must be drained and winterized before freezing temperatures or its tanks and internal components will split as the water expands. Plaintiff was excluded from the premises throughout the winter of 2024–25 and was therefore unable to winterize any of it. As to the units Plaintiff has since been able to examine, the tanks and associated components were destroyed by freezing, and replacement parts alone exceed $20,000, exclusive of labor and of the diminished value of the equipment. Additional units to which Plaintiff has not regained access are believed to have sustained the same damage.

41.     Plaintiff timely appealed the eviction order. On September 5, 2024, the Honorable Richard R. Stalbrink, Jr. was appointed and entered an immediate blanket stay directing that the court would take no action in the matter prior to the appeal being decided. On October 4, 2024, Judge Stalbrink entered a formal stay order requiring a $10,000 supersedeas bond plus $1,100

11

per month and expressly staying all enforcement of the eviction order. That stay remained in effect until the Indiana Court of Appeals issued its decision on June 4, 2025. Plaintiff posted the bond and continued to make the required monthly payments through February 2025 — that is, past the January 21, 2025 sale of the Property.

42. Notwithstanding those stay orders, Epstein permitted an agent of a prospective purchaser to enter and occupy Plaintiff's leased space beginning in September 2024, months before that purchaser held any ownership interest in the Property. That individual was not a stranger to Epstein or to the Property. He had previously held a tenancy from Epstein in the third section of the Property and had been removed from it for nonpayment of rent before the events described in this Complaint. Epstein's grant of permission to a non-party to enter and exercise effective control over the Property during the stay period was a further violation of the court's orders.

43. The extent of that non-party's control is illustrated by an incident in October 2024. Plaintiff was permitted onto the premises for approximately one hour, not by Epstein and not by order of any court, but by the agent of the prospective purchaser. During that hour, and as a condition of Plaintiff removing any of his own property from the premises, that agent demanded that Plaintiff post a bond. Neither that agent nor the prospective purchaser held any ownership interest in the Property, any leasehold interest, or any order of any court authorizing such a demand. Plaintiff had already posted a $10,000 supersedeas bond with the Clerk of the LaPorte Circuit and Superior Courts on October 4, 2024.

44. During that one hour of access in October 2024, Plaintiff observed that identifiable items of his commercial inventory were already missing from the premises, including several hundred pieces of sterling silver flatware held for resale and for their scrap metal value. Plaintiff was not permitted to return to the premises again until this Court — the LaPorte Superior Court — entered its order of December 27, 2024 granting access. The items Plaintiff identified as missing in October 2024 were removed during a period when Epstein held title to the Property, had excluded Plaintiff from it, and had admitted a non-party to it.

45. Epstein sought a court order regarding Plaintiff's property during the lockout period. That effort was blocked by Plaintiff's pending appeal. Epstein then sold the Property to

Peachtree Partners-Indiana I LLC on January 21, 2025 — while the Stalbrink stay order was still in effect, while Plaintiff's appeal was still pending, and while Plaintiff's entire commercial inventory remained inside. Epstein's conduct in seeking a court order, being blocked by the appeal, and proceeding anyway through the mechanism of a third-party sale was willful and warrants punitive damages.

### F. Epstein's Handling of Plaintiff's Property After the Lockout

46.    Epstein assumed exclusive physical control of Plaintiff's commercial inventory when he excluded Plaintiff from the premises. Having done so, Epstein owed Plaintiff a duty to exercise reasonable care over that property and to refrain from disposing of it, transferring it, or exposing it to loss. Epstein never provided Plaintiff written notice regarding the disposition of the inventory, never afforded Plaintiff a supervised opportunity to retrieve it, never caused it to be moved to a secure storage facility, and ultimately transferred custody of it to a third party by selling the Property with the inventory inside, in violation of a court-ordered stay.

47.    At no time did Epstein inventory Plaintiff's property, photograph it, log its condition, record who entered the premises, or account for anything removed from them. Any imprecision in identifying which specific items were lost, when they were lost, or at whose hand is the direct product of Epstein's own failure to discharge these obligations while he held exclusive control of Plaintiff's goods.

### G. The July 2024 Rent Payment and the Appellate Fee Claims

48.    In July 2024, Plaintiff transferred $1,100 to Epstein by Zelle electronic funds transfer as rent for July 2024. Epstein accepted and deposited the payment the same day, a fact confirmed in filings made by Epstein's own counsel before LaPorte Superior Court. On July 31, 2024 — within the very month for which Plaintiff had paid rent — Epstein locked Plaintiff out of the Property. Epstein has never returned the $1,100.

49.    Epstein, through successive counsel, pursued attorney fees against Plaintiff on appeal. The Indiana Court of Appeals denied Epstein's appellate fee requests in their entirety and further found that Plaintiff's appeal was not frivolous. The pursuit of those claims was part of Epstein's deliberate strategy to exhaust Plaintiff financially through litigation.

## IV. NO PRECLUSIVE EFFECT OF PRIOR STATE COURT PROCEEDINGS

50.    Plaintiff anticipates that Defendants may assert that prior or pending proceedings in LaPorte Superior Court No. 4, including the underlying eviction action, filed on the small claims docket of LaPorte Superior Court No. 4 as Cause No. 46D04-2404-EV-000564 and now pending before LaPorte Superior Court No. 2 as Cause No. 46D02-2404-EV-000564, and any counterclaim asserted therein, bar, limit, or cap the claims asserted in this Complaint. That argument fails for the following independent reasons.

51.    The state court eviction proceeding adjudicated only the narrow question of the right to possession of 210 Freyer Road and, in subsequent proceedings, a claim for attorney fees arising from that eviction. The state court did not adjudicate the independent claims asserted here — wrongful eviction and ouster of 208 Freyer Road, trespass, conversion of commercial inventory, fraud in the inducement of the lease, alter ego liability, breach of the Sale Addendum, intentional infliction of emotional distress, or tortious interference with business relations and employment.

52.    The eviction action proceeded on a docket of limited jurisdiction. Claims exceeding that jurisdictional maximum could not have been fully and fairly litigated in that forum. Claim preclusion does not attach to claims that the prior forum lacked authority to adjudicate.

53.    Plaintiff did not pursue any counterclaim to decision in the state court proceeding. Plaintiff filed a counterclaim in the eviction action on July 3, 2024. At the damages hearing held June 10, 2026, Plaintiff moved to dismiss that counterclaim; the state court granted the motion and dismissed the counterclaim without prejudice. No counterclaim asserted by Plaintiff was ever adjudicated on its merits, and no judgment has ever been entered on any counterclaim asserted by Plaintiff.

54.    The dismissal of Plaintiff's counterclaim without prejudice was ordered in open court and is recorded in the Chronological Case Summary maintained by the Clerk of the LaPorte Circuit and Superior Courts. Under Indiana Trial Rule 77(B), the Chronological Case Summary is an official record of the trial court, and an entry within it may be altered only by a corrective entry.

14

55. Indiana Small Claims Rule 5(B) provides that a defendant who pursues a counterclaim to decision waives the excess of that claim over the jurisdictional maximum of the small claims docket. That rule operates only upon a defendant who pursues a counterclaim to decision. Plaintiff did not do so. The rule therefore has no application to this action, and no waiver of any claim or any portion of any claim has occurred.

56. The state court that entered the July 22, 2024 possession order expressly declined to adjudicate the lease addendum provision governing a future sale of the Property, stating in that order that the addendum's treatment of selling the property in the future was not at issue in that case. The obligation to give notice of a sale and to return prepaid rental upon a sale was therefore never litigated or determined in the state forum, and no preclusion doctrine reaches it.

57. That same order did not find that Plaintiff had failed to pay the rent Epstein's complaint demanded. It found instead that neither party had proven by a preponderance of the evidence whether the disputed payment was received. Possession was awarded on a separate non-renewal theory, not on the nonpayment allegation that was the stated basis for filing the eviction.

58. As of the date of this filing, no final judgment on the merits of Plaintiff's affirmative claims has been entered in any court. The damages proceeding before Judge Stalbrink addresses only the landlord's claims for past-due rent, utilities, and attorney fees. That proceeding was heard on June 10, 2026; both parties submitted proposed forms of order on July 10, 2026; and the matter remains under advisement with no ruling entered. Claim preclusion requires a final judgment on the merits of the same claims between the same parties. No such judgment exists.

59. This Complaint does not ask this Court to review, reverse, void, or modify the state court's possession judgment or any other state court order. Plaintiff accepts those orders as entered and seeks damages for independent wrongs — principally the self-help exclusion from 208 Freyer Road, as to which no state court ever entered any order at all. The injuries alleged here were caused by Epstein's conduct, not by any state court judgment.

60. The damages sought in this action — including inventory loss in excess of $200,000, recovery of rents paid under the alter ego and fraud theories, punitive damages, treble damages, and damages for emotional distress and tortious interference — were never before any state court and are not limited by any state court proceeding or by any small claims jurisdictional cap.

* * *

## COUNT I — WRONGFUL EVICTION, OUSTER, AND TRESPASS (208 FREYER ROAD)

61. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

62. Plaintiff held a written contractual right to possess and occupy 208 Freyer Road. The Second Addendum to the lease leased two additional sections of that building to Plaintiff and fixed a single monthly rent of $1,100.00 covering all property leased, including 208 Freyer Road. Epstein demanded and accepted that rent throughout the tenancy. In the alternative, and whatever the source of the right, Plaintiff was in actual, open, and lawful possession of 208 Freyer Road with Epstein's knowledge and acquiescence at all times prior to the lockout.

63. No court order of any kind reached 208 Freyer Road at the time of the lockout. Epstein's eviction complaint sought possession of 210 Freyer Road only. The order entered July 22, 2024 in that proceeding directed Plaintiff to vacate the premises of 210 Freyer Road only; it did not mention 208 Freyer Road, notwithstanding that the same order recited the existence of the Second Addendum leasing additional space to Plaintiff, and it expired by its own terms thirty days after its entry. No order requiring Plaintiff to vacate 208 Freyer Road was entered by any court until June 6, 2025 — more than ten months after Epstein excluded Plaintiff from that building.

64. Under Indiana common law, a landlord who wishes to dispossess a tenant in lawful possession must proceed through the courts. The wrongful ouster or exclusion of a tenant in lawful possession is actionable as wrongful eviction, as trespass, and as breach of the covenant

16

of quiet enjoyment. Here that covenant was not merely implied: Section 14(b) of the lease expressly provided that upon paying rent and performing his covenants, Plaintiff would have quiet possession of the Premises for the entire term.

65. On or about July 31 and August 1, 2024, Epstein — without any court order, without the assistance or authorization of the Sheriff, and without any lawful authority — changed the locks and excluded Plaintiff from 208 Freyer Road, ousting Plaintiff from premises he had the right to occupy and trapping his commercial inventory inside.

66. At or about the same time that Epstein renewed the earlier purchase agreement, Peachtree Partners-Indiana I LLC approached him with a substantially higher all-cash offer to purchase the Property as-is. From that point forward Epstein had a direct financial incentive to prolong Plaintiff's exclusion from the Property: continued exclusion prevented the earlier purchase agreement from closing on its terms and allowed it to lapse, leaving Epstein free to sell to the higher bidder. Epstein did precisely that, conveying the Property to Peachtree Partners-Indiana I LLC on January 21, 2025. Plaintiff's continued exclusion from the Property therefore served Epstein's own financial interest and was not required by any court order or by any term of the lease.

67. The LaPorte County Sheriff was present at the Property to execute the possession order. The Sheriff declined to remove Plaintiff from the 208 Freyer Road building, for the stated reason that 208 Freyer Road was not identified in the eviction complaint or in the court's order. Having been told by the officer charged with executing the order that no authority existed as to 208 Freyer Road, Epstein changed the locks on that building himself the same night.

68. The $1,100.00 monthly rent was a single, undivided sum covering both 208 and 210 Freyer Road under the Second Addendum. Epstein demanded and accepted that rent for the month of July 2024, and on August 1, 2024 changed the locks and excluded Plaintiff from 208 Freyer Road. Whatever any court determined regarding Plaintiff's right to possess 210 Freyer Road, no proceeding was brought and no order was entered as to 208 Freyer Road at the time of the lockout.

69.    As a direct and proximate result, Plaintiff was denied access to 208 Freyer Road, was prevented from completing the removal of his commercial inventory, and suffered substantial damages.

70.    Epstein's conduct was deliberate and in knowing disregard of Plaintiff's possessory rights. Punitive damages are warranted.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, costs, and all other relief the Court deems just and proper.

\* \* \*

### COUNT II — CONVERSION OF COMMERCIAL INVENTORY

71.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72.    At the time of the lockout, Plaintiff's commercial inventory — used restaurant and pre-owned medical equipment held for sale in the ordinary course of business — was located inside 208 and 210 Freyer Road and had a value in excess of $200,000. Plaintiff owned that inventory and was entitled to immediate possession of it.

73.    Epstein intentionally and without legal authority exerted unauthorized control over that inventory and deprived Plaintiff of access to it.

74.    Before and after the lockout, and on multiple occasions, Epstein deliberately left the 208 and 210 Freyer Road premises unsecured, repeatedly opened the interior doorway Plaintiff had blocked to secure his inventory space, posted a written directive that the doorway remain open at all times, and thereby created and maintained unrestricted access for a person formerly employed by Plaintiff and for other persons who had no right to be present. Items of Plaintiff's commercial inventory were removed without Plaintiff's knowledge or consent.

75.    Epstein's sale of the Property to Peachtree Partners-Indiana I LLC on January 21, 2025 — while Plaintiff's inventory remained inside, while a court-ordered stay was in effect, and

while Plaintiff's appeal was pending — constituted a further act of conversion, transferring custody of Plaintiff's property to a third party without authority.

76. Plaintiff's losses include, without limitation: identifiable items observed missing during Plaintiff's brief October 2024 access, including several hundred pieces of sterling silver flatware held for resale and scrap value; commercial beverage equipment whose holding tanks and internal components were destroyed by freezing because Epstein's exclusion of Plaintiff made winterization impossible, with replacement parts alone exceeding $20,000 as to the units so far examined; and the balance of Plaintiff's commercial inventory.

77. To the extent any other person exerted unauthorized control over Plaintiff's property during the period of Plaintiff's exclusion, Epstein and that person are concurrent tortfeasors as to the resulting loss. Conversion is an intentional tort, and Indiana's Comparative Fault Act does not abrogate joint and several liability for intentional torts. Epstein is therefore liable for the entirety of the loss occurring during the period in which he held title to the Property and controlled access to it, whether or not another person physically removed any given item. One who knowingly gives substantial assistance to another in the commission of a tort is liable for the resulting harm.

78. Having assumed exclusive control of Plaintiff's property, Epstein owed and breached a duty of reasonable care over it.

79. Epstein's conduct was deliberate, malicious, and in knowing disregard of Plaintiff's property rights and of the court's orders. Punitive damages are warranted.

80. As a direct and proximate result, Plaintiff suffered loss of commercial inventory valued in excess of $200,000, lost business income, and other consequential damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages in an amount to be proven at trial, punitive damages, costs, and all other relief the Court deems just and proper.

\* \* \*

## COUNT III — FRAUD IN THE INDUCEMENT OF LEASE AND ALTER EGO LIABILITY

81. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

82. On or about June 1, 2023, at the execution of the commercial lease for 210 Freyer Road, Epstein presented Lake Front Associates LLC to Plaintiff as the owner and lessor of the Property. That representation was made in the written lease itself, which named the LLC as lessor, and in Epstein's dealings with Plaintiff surrounding execution.

83. To the extent Epstein personally held record title to the Property, that representation was false and Epstein knew it to be false when he made it, because he knew he personally held title and that the named lessor did not.

84. Independently, and whether or not the LLC held record title, Epstein represented to Plaintiff that the named lessor was an entity capable of performing the obligations of the lease, including the obligation under the Sale Addendum to return prepaid rental upon a sale of the Property. That representation was false when made. Epstein closed the LLC's bank account within months of lease execution, never capitalized the LLC to perform that obligation, and never intended that the prepaid rental would be returned.

85. Epstein compounded these representations by affirmative concealment. He deliberately withheld the identity of the true owner of the Property from Plaintiff, as his sworn testimony of June 10, 2026 confirms. He had no management contract or other written authority to act for the LLC as to the Property, because no legitimate landlord-entity relationship existed.

86. Epstein made these representations for the purpose of inducing Plaintiff to enter the lease, to induce Plaintiff to pay approximately $10,000 in rent in advance, and to interpose an insolvent, undercapitalized entity between himself and any liability arising from the tenancy.

87. Plaintiff reasonably and justifiably relied on these representations. Plaintiff had no means of knowing the true state of the LLC's title, capitalization, or solvency, and Epstein's refusal to identify the owner foreclosed inquiry. Had Plaintiff known that the named lessor was

20

an unfunded instrumentality of Epstein that would be incapable of returning his prepaid rental, Plaintiff would not have entered the lease on the terms presented, would not have paid rent in advance, and would not have moved his inventory into the Property.

88.   Because the LLC is Epstein's alter ego, all rental payments made by Plaintiff to or through the LLC were in law payments made to Epstein personally, and Plaintiff is entitled to recover them from Epstein.

89.   The alter ego doctrine requires that the corporate form be disregarded and that Epstein be held personally liable for all obligations of the LLC, including the obligation to return rents collected without legal authority.

90.   As a direct and proximate result of Epstein's fraud, Plaintiff entered a lease with a lessor Epstein knew to be incapable of performing it, paid approximately $10,000 in rent in advance that was never returned, was denied the protections a properly constituted landlord-tenant relationship would have afforded, and suffered all damages flowing from the fraudulently induced tenancy.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages including recovery of all rents paid during the tenancy, consequential damages, punitive damages, costs, and all other relief the Court deems just and proper.

* * *

## COUNT IV — BREACH OF WRITTEN CONTRACT (SALE ADDENDUM)

91.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

92.   The lease contained a Sale Addendum providing that upon the sale of the Property or an accepted offer with customary deposit, the Landlord could terminate on sixty days' written notice, whereupon rental would cease as of the date of that notice and any prepaid rental would be returned to Plaintiff.

93.    Under Section 3(b), rent was payable on the first day of each calendar month, in advance. Every monthly payment Plaintiff made was therefore a payment of rent in advance for a period not yet occupied. Prepaid rental within the meaning of the Sale Addendum includes any rent so paid for a period after which rental was to cease.

94.    At the damages hearing held June 10, 2026, Epstein testified under oath to the substance of this arrangement. He described Plaintiff having paid rent in advance in exchange for a better rate, subject to a sixty-day cancellation notice, and acknowledged that if he sold the Property before the term ran he would owe the unearned portion back to Plaintiff as prepaid rent.

95.    Plaintiff performed his obligations under the lease, or was excused from performance by Epstein's conduct.

96.    Epstein sold the Property to Peachtree Partners-Indiana I LLC on January 21, 2025, without providing sixty days' written notice to Plaintiff, without returning Plaintiff's prepaid rental, and without giving the buyer the opportunity to continue the Lease with Plaintiff as the First Addendum required. Had Epstein given the notice the Sale Addendum required, Plaintiff's rental obligation would have ceased as of the date of that notice. Instead Plaintiff continued to pay, and did pay, through February 2025 — past the sale. The prepaid rental recoverable by Plaintiff includes all rent paid in advance for periods after which rental should have ceased, in an amount to be established at trial.

97.    To the extent any state court determined that the initial term of the lease expired on June 1, 2024, that determination does not defeat this Count. The First Addendum expressly continued the tenancy on a month-to-month basis after June 1, 2024, and Epstein continued to demand and to accept rent thereafter. Further, the Sale Addendum obligation to return prepaid rental upon a sale of the Property is an obligation to return money already paid; it was not extinguished by the expiration of the term during which that money was paid.

98.    Epstein is personally liable for this breach. He signed the lease in his own name as Landlord in addition to signing for the LLC, and he was at all times the true party in interest on the landlord side of the lease, with the LLC serving as his alter ego.

99. As a direct and proximate result, Plaintiff suffered damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages in an amount to be proven at trial, prejudgment interest, costs, and all other relief the Court deems just and proper.

* * *

### COUNT V — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Indiana recognizes a cause of action for intentional infliction of emotional distress where a defendant, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to another.

102. Epstein's conduct, viewed in its totality, was extreme and outrageous:

(a) Epstein manufactured a non-payment eviction, which the state court found he had not proven, rather than exercising the sixty-day cancellation right he already held, in order to avoid his contractual obligation to return prepaid rental upon a sale, filing the eviction approximately two hours after his attorney agreed to wait and three days before the cure period expired;

(b) Epstein threatened his own residential tenants with immediate eviction from their homes if they continued to perform lawful work for Plaintiff, deliberately destroying Plaintiff's labor supply during a critical business transition;

(c) Epstein repeatedly reopened an interior doorway Plaintiff had blocked to secure his inventory, and then posted a written sign requiring that it remain open at all times, eliminating Plaintiff's ability to secure commercial inventory valued in excess of $200,000 against persons Epstein knew were not suitable to be given access;

(d)   Epstein locked Plaintiff out mid-move, with five or more semi-trailers still to be loaded, on the same day he signed a purchase agreement conditioned on Plaintiff's removal, stranding Plaintiff's entire inventory inside;

(e)   Epstein pursued appellate fee claims that the Indiana Court of Appeals denied in their entirety, as part of a deliberate strategy to exhaust Plaintiff financially through prolonged litigation;

(f)   Epstein sold the Property, with Plaintiff's entire inventory inside, in deliberate evasion of a court-ordered stay, after having sought court authorization, been blocked by Plaintiff's appeal, and proceeded anyway through a third-party sale; and

(g)   Epstein applied pressure to Plaintiff's landlord at 107 Freyer Road, where Plaintiff had operated for fourteen years, compounding the destruction of Plaintiff's business relationships and commercial reputation.

103.   Each of the foregoing acts was intentional. Taken together, they constitute a coordinated campaign targeting Plaintiff personally, designed to destroy his business, eliminate his livelihood, deprive him of his inventory, destroy his employment relationships, and exhaust him financially. This pattern exceeds all reasonable bounds of decency.

104.   As a direct and proximate result of Epstein's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, including anxiety, loss of sleep, reputational harm in the commercial community, and the destruction of a business he had operated for over fourteen years.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages for emotional distress, punitive damages, costs, and all other relief the Court deems just and proper.

* * *

## COUNT VI — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND EMPLOYMENT

24

105.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

106.    Plaintiff maintained existing employment and business relationships with workers, some of whom were Epstein's residential tenants, who performed services critical to Plaintiff's commercial equipment business and to his ability to move and protect his inventory.

107.    Epstein had actual knowledge of these relationships. Epstein sent written communications to Plaintiff expressly stating that his residential tenants would no longer be permitted to work for Plaintiff, and simultaneously threatened those tenants with immediate eviction from their homes if they continued to perform work for Plaintiff.

108.    Epstein's conduct was intentional and without justification. A landlord possesses no lawful authority to condition a residential tenant's right to continued housing upon that tenant's choice of employer. Epstein's use of the threat of homelessness to coerce workers to abandon their employment with Plaintiff was illegal conduct and constitutes tortious interference with Plaintiff's existing and prospective employment and business relationships.

109.    Epstein's interference was deliberately timed to coincide with Plaintiff's most vulnerable period — during the pending eviction, while Plaintiff was attempting to move his inventory and complete his business transition — in order to maximize harm to Plaintiff.

110.    As a direct and proximate result, Plaintiff lost the services of workers critical to his operations, was impaired in his ability to remove and protect his commercial inventory, suffered lost business income, and sustained damage to his business and employment relationships.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, costs, and all other relief the Court deems just and proper.

* * *

## COUNT VII — INDIANA CRIME VICTIMS RELIEF ACT

*(Ind. Code § 34-24-3-1)*

111.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112.   By knowingly or intentionally exerting unauthorized control over Plaintiff's commercial inventory, and by knowingly facilitating the removal of Plaintiff's inventory by unauthorized third parties, Epstein committed criminal conversion and theft within the meaning of Indiana Code §§ 35-43-4-3 and 35-43-4-2.

113.   Under Indiana Code § 34-24-3-1, a person who suffers a pecuniary loss as a result of a violation of those criminal statutes may recover up to three (3) times the actual damages sustained, the costs of the action, and reasonable attorney's fees.

114.   Plaintiff suffered a pecuniary loss as a direct and proximate result of Epstein's conduct and is entitled to treble damages, the costs of this action, and reasonable attorney's fees.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, for three (3) times his actual damages, the costs of this action, reasonable attorney's fees, and all other relief the Court deems just and proper.

\* \* \*

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Bricker respectfully requests that this Court enter judgment in his favor and against Defendants James M. Epstein and Lake Front Associates LLC, jointly and severally, as follows:

(A)   Compensatory damages on all Counts in amounts to be proven at trial, including the full value of Plaintiff's converted commercial inventory (in excess of $200,000); all rents paid by Plaintiff during the tenancy, recoverable under the fraud and alter ego theories; lost business income; prepaid rental due under the Sale Addendum; and damages for emotional distress and tortious interference;

(B)   Treble damages, the costs of the action, and reasonable attorney's fees under the Indiana Crime Victims Relief Act, Ind. Code § 34-24-3-1, on Counts II and VII;

26

(C) Punitive damages on Counts I, II, III, V, and VI;

(D) A declaration that Lake Front Associates LLC is the alter ego of Defendant James M. Epstein and that Epstein is personally liable for all obligations of the LLC, including all rents collected from Plaintiff during the tenancy;

(E) A declaration that no aspect of any LaPorte County state court proceeding, including any counterclaim or eviction damages proceeding, bars, limits, or caps the claims or damages recoverable in this action;

(F) Prejudgment and post-judgment interest as allowed by law;

(G) Costs of this action; and

(H) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

John Bricker, Pro Se

P.O. Box 144

New Buffalo, Michigan 49117

(269) 612-8946

octovent@fastmail.fm

Dated: _____July 30_____, 2026

## VERIFICATION

I, John Bricker, declare under penalty of perjury under the laws of the United States of America that the foregoing Complaint is true and correct to the best of my knowledge, information, and belief.

27

Executed on: _____, 2026

_____
John Bricker

28