UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

-FILED-
SEP 03 2026
At ____________ M
Chanda J. Berta, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JOHN BRICKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:26-cv-01125-DRL-SJF |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| JAMES M. EPSTEIN, individually, and | ) | |
| LAKE FRONT ASSOCIATES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT FOR DAMAGES**

Plaintiff John Bricker, proceeding pro se, files this Amended Complaint as of course under Fed. R. Civ. P. 15(a)(1).

**Plaintiff seeks money damages only. Plaintiff does not seek possession of real estate, does not seek vacatur or modification of any state-court order, and does not ask this Court to review any determination of any Indiana court. Every claim asserted here arises from Defendants' own conduct.**

## I. THE PARTIES AND CITIZENSHIP

1. Plaintiff John Bricker is a natural person domiciled in New Buffalo, Berrien County, Michigan. He resides there, intends to remain there indefinitely, and maintains no domicile in any other state. Plaintiff was a citizen of the State of Michigan on the date the original Complaint was filed and remains so. Plaintiff operated a used restaurant and pre-owned medical equipment business from commercial premises in Michigan City, LaPorte County, Indiana, for more than fourteen years.

2. Defendant James M. Epstein is a natural person. On information and belief formed after reasonable inquiry, Epstein resides at Unit 102, The Hill Apartments, 511 N. Notre Dame Avenue, South Bend, St. Joseph County, Indiana 46617, an address also reflected in filings made on behalf of Lake Front Associates LLC with the Colorado Secretary of State. Epstein returned to Indiana from Florida approximately six months before the original Complaint was filed, resides in South Bend, and intends to remain there indefinitely. Epstein was domiciled in Indiana and was a citizen of the State of Indiana on the date the original Complaint was filed. Should Epstein contend he was then domiciled in Florida, complete diversity is unaffected: under neither characterization was Epstein a citizen of Michigan.

3. Epstein is not, and at no time relevant to this action has been, a citizen or domiciliary of the State of Michigan.

4. Defendant Lake Front Associates LLC (the "LLC") is a limited liability company organized under the laws of Colorado. The citizenship of a limited liability company is the citizenship of each of its members, determined as of the date the complaint was filed, and each member must be affirmatively identified by name and by type. Thomas v. Guardsmark, LLC, 487 F.3d 531, 534 (7th Cir. 2007); Meyerson v. Harrah's E. Chi. Casino, 299 F.3d 616, 617 (7th Cir. 2002).

5. The sole member of Lake Front Associates LLC is, and was on the date the original Complaint was filed, James M. Epstein, a natural person. The LLC had no other member of any kind on that date and has none now. No member of the LLC is or was itself a limited liability company, partnership, corporation, or other entity whose citizenship would require further tracing. Plaintiff alleges sole membership on the following bases:

(a) Epstein's sworn testimony. At the damages hearing held June 10, 2026 in LaPorte Superior Court No. 2, Cause No. 46D02-2404-EV-000564, Epstein was asked under oath: "So Lakefront Associates - that's your LLC? Are you the sole member of that LLC?" Epstein answered: "Yes, I am." Immediately thereafter Epstein testified: "It's a Colorado LLC, but licensed to do business in Indiana."

(b) The LLC's own filing with the Colorado Secretary of State. A Written Consent of the Unit Holders to Vote dated April 27, 2018, filed with the Colorado Secretary of State as an attachment under document number 20181353326, recites that the company "has issued its units to 100% ownership to James M. Epstein." The consent bears the signature blocks "James M. Epstein, 1000 Units" and "James M. Epstein, Managing Partner." Membership interests in a limited liability company are represented by its units. No other person holds any unit.

(c) The recitation of the Indiana Court of Appeals. In Bricker v. Epstein, 264 N.E.3d 647 (Ind. Ct. App. 2025) (mem. dec.), that court stated that "Epstein owns property in Michigan City and is the president and sole member of Lakefront."

(d) Plaintiff has been unable to obtain further membership records despite reasonable inquiry. Lake Front Associates LLC may not appear in this Court except through licensed counsel and will be able to confirm its membership upon appearance.

6. Because the sole member of Lake Front Associates LLC was a citizen of Indiana on the date the original Complaint was filed, the LLC was on that date a citizen of Indiana and of no other State. Whatever Epstein's domicile is determined to be, the LLC shares it, and under no determination is the LLC a citizen of Michigan.

7. The LLC's Indiana certificate of authority was administratively revoked on May 5, 2025 and has not been reinstated. At the June 10, 2026 damages hearing, asked whether the Colorado limited liability company was in good standing, Epstein answered that it was not and testified: "I'm not in business anymore." The LLC's Colorado registration has since been restored to Good Standing. Neither the State of organization nor administrative status in any State alters citizenship, which follows the member.

## II. JURISDICTION AND VENUE

8. This Court has original subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity of citizenship existed on the date the original Complaint was filed and exists now. No Defendant is a citizen of Michigan.

9. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff's commercial inventory alone exceeded that sum in value. Plaintiff further seeks prepaid rental due under the Sale Addendum, relocation costs exceeding $22,000, lost business income, punitive damages, and treble damages under Indiana Code § 34-24-3-1.

10. No claim asserted here arises under federal law. No claim asks this Court to review, reverse, void, or modify any judgment or order of any Indiana court. Plaintiff's injuries were caused by Defendants' own acts and not by any state-court judgment. See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).

11. Venue is proper under 28 U.S.C. § 1391(b)(2). The premises at 208 and 210 Freyer Road, Michigan City, Indiana 46360, lie in LaPorte County, within this District and Division.

## III. FACTUAL ALLEGATIONS

### A. The Lease, the Addenda, and the Premises

12. On or about May 18, 2023, Plaintiff and Lake Front Associates LLC executed a written commercial lease for the premises at 210 Freyer Road, Michigan City, Indiana, with an effective date of June 1, 2023. The Lease is dated June 1, 2023 on its face. Its opening paragraph names the Landlord as "Lakefront Associates" - without any corporate or limited-liability designation - "whose address is 3609 East U.S. Highway 12." Section 1 demises "the real property located at 210 Freyer Rd. Michigan City, Indiana 46360 consisting primarily of 2718 square feet." No entity named "Lakefront Associates" is or was registered in Indiana or Colorado. A true and correct copy of the Lease, together with the two written addenda described below, is attached as Exhibit A and incorporated under Fed. R. Civ. P. 10(c).

13. The Lease bears three signature lines. The first is designated "(Tenant)" and carries the print name "John Bricker." The second and third are each designated "(Landlord)." The print-name line of the second reads "Jim Epstein for Lakefront Associates, LLC." The print-name line of the third bears the handwritten name "JAMES EPSTEIN" above a separate executed signature. The Lease thus carries two Landlord signature lines, one in a stated representative

capacity and one in an individual name. At the time of execution, record title to the Property stood in James M. Epstein personally and not in Lake Front Associates LLC.

14. Two written addenda were executed contemporaneously with the Lease and as part of the same transaction. They are included within Exhibit A and incorporated under Rule 10(c). The Lease and its two addenda were executed as a single transaction and constitute one integrated agreement.

15. The First Addendum provided that the Lease would run twelve months from June 1, 2023 and thereafter continue month to month subject to a sixty-day cancellation for any reason by either party, and that written notice to terminate as of June 1, 2024 was to be given by April 1, 2024. It further represented that the Landlord had no active potential buyers for the Property at the time of signing, and provided that the Landlord would give any purchaser the opportunity to continue the Lease with Plaintiff.

16. The First Addendum contains the provision the parties have referred to as the Sale Addendum, which states:

> *"For the initial 12 month period, upon the sale of the property or accepted offer with customary deposit by buyer landlord shall have the right to terminate the lease with 60 days written notice. Upon said notice rental shall cease, on the date of said notice and any prepaid rental shall be returned to Tenant."*

17. **The First Addendum does not bear a signature. It was executed contemporaneously with the Lease as part of a single transaction and was performed by both parties throughout the tenancy. The Lease itself so provides. Section 14(i), captioned "Contemporaneous Agreements," states: "This Lease is executed contemporaneously with an addendum regarding the details of this lease agreement. Such addendum takes precedence over other terms incorporated in the Lease agreement when in conflict." The**

**signed Lease therefore recites the addendum's existence, its contemporaneous execution, and its precedence. Both the LaPorte Superior Court and the Indiana Court of Appeals treated the First Addendum as part of the parties' agreement and quoted its terms. Epstein has repeatedly invoked its provisions, including at the June 10, 2026 damages hearing, where he testified that his April 24, 2024 eviction filing "was my 60-day notice that the building was sold," and where he argued at length over the meaning of the term "prepaid rent" as used in it. Further, on May 31, 2024, in Plaintiff's Answer to Defendant's Request for Temporary Restraining Order filed in Cause No. 46D04-2404-EV-000564, counsel for Lake Front Associates LLC admitted at paragraph 16 that "the lease is to terminate on May 31, 2024" — the precise termination date produced by the First Addendum's twelve-month term and its April 1, 2024 notice provision. At no time has Epstein or the LLC contended that the First Addendum is not binding.**

18. The Second Addendum is captioned "LEASE AGREEMENT / Addendum 2," is dated June 1, 2023, and names the same Landlord at the same 3609 East U.S. Highway 12 address. It provides at paragraph A that "Both parties agree to lease two additional sections of Building 1 under the same conditions as the original Lease Agreement dated June 1, 2023," at an additional $400.00 per month, and that "Should the adjacent tenant vacate the balance of Building One Lessee shall have the option to lease said space for an additional $200.00 per month under the same conditions as the original lease." Paragraph B provides that "All conditions of the initial Lease Agreement dated June 1, 2023 shall apply to this second Addendum agreement." The Second Addendum does not identify the additional space by street address; the term it uses is "Building 1." The two additional sections so leased are located in the building whose street address is 208 Freyer Road. Unlike the First Addendum, the Second Addendum is signed by

both parties, the Landlord signature line reading "James Epstein / Lakefront Associates, LLC. (Landlord)."

19. The Lease identifies the leased premises as 210 Freyer Road, Michigan City, Indiana. The Second Addendum identifies the additional leased space only as "Building 1," a designation appearing in no other document. Separately, and in a different place, the Lease identifies the Landlord's address as 3609 East U.S. Highway 12. That address was Epstein's office at the time of execution. It is a different section of the Property from either building Plaintiff occupied, and it is the section Epstein later converted to an apartment. The building known as 208 Freyer Road has its own separate entrance and its own loading docks, and bears the numerals "208" affixed to its exterior. In filings in the state-court proceedings 208 Freyer Road has at times been referred to as 3609 East U.S. Highway 12 and as 3609 East Dunes Highway. Those designations are inaccurate. The building is 208 Freyer Road and is referred to in this Complaint by that designation.

20. The Property comprises four physically connected sections, each with a separate entrance. Plaintiff leased 210 Freyer Road under the original Lease and two sections of 208 Freyer Road under the Second Addendum. A third section was let to another tenant. The fourth was the office at 3609 East U.S. Highway 12 - the Landlord's address stated in the Lease - which Epstein converted to an apartment; it directly adjoins Plaintiff's 208 space and was continuously occupied throughout the tenancy and after Plaintiff was locked out.

21. The Lease contained, among others: § 14(a), requiring that all notices and demands by the Landlord to the Tenant be sent by certified United States mail, postage prepaid; § 11(b), providing that a monetary default arises only where the Tenant's failure to pay continues for ten days after written notice by the Landlord; § 3(b), requiring rent payable on the first day of each

calendar month, in advance; § 14(b), an express covenant of quiet possession for the entire term; § 10, permitting Landlord entry only upon twenty-four hours' notice; § 12(a), permitting attorney fees only where legal action becomes necessary following agreed-upon proper notices; § 14(c), providing that no provision may be amended or added to except by a writing signed by the parties; and § 14(i), providing that an addendum controls where it conflicts with the Lease.

**B. The Prepayment, the Undisclosed Listing, and the Concealed Ownership**

22. On May 18, 2023, Plaintiff delivered to Epstein a cashier's check in the amount of $3,500.00, representing five months of rent for the period June 1, 2023 through November 1, 2023. The $700.00 monthly rate was the prevailing market rate for comparable commercial space and situation and was not discounted. Epstein needed funds to pay past due property taxes and sought payment substantially in advance; Plaintiff's consideration for prepaying was the protection contained in the First Addendum. The Lease acknowledges that payment on its face, immediately below the signature lines: "The signing of this agreement acknowledges the Landlord's receipt of $3500.00 from the Tenant for: Full Rental Payment for the months of June 2023 thru October 2023."

23. Those protections mattered because Plaintiff's business could not be relocated cheaply. The cost of moving Plaintiff's commercial inventory exceeded $22,000. Sixty days' written notice, cessation of rent as of the date of that notice, and return of prepaid rental together reduced that exposure.

24. Epstein listed the Property for sale with a licensed real estate brokerage at an asking price of $890,000.00. The date of that listing is within the knowledge of Epstein and the listing brokerage and is not presently available to Plaintiff. On information and belief the listing was

executed on or before June 1, 2023, the effective date of the Lease. Epstein did not disclose the existence of that listing to Plaintiff before, at, or after execution.

**25. Epstein never disclosed to Plaintiff, at execution or at any time during the tenancy, the identity of the true owner of the Property. Record title stood in Epstein personally. At the June 10, 2026 damages hearing Epstein was asked, "When you entered the lease agreement, did you ever let Mr. Bricker know who the owner of the real estate was?" Epstein answered: "Why would I do that?" Asked whether he told Plaintiff the owner was Lakefront Associates or himself, Epstein answered: "I don't recall." Epstein held no management contract or other written authority to act for the LLC as to the Property.**

26. During the parties' negotiations Epstein stated that he would not return rent that had not been paid on time. Plaintiff therefore ensured that every rental payment was delivered on or before the first day of each month, so that all rent paid would remain prepaid rental within the meaning of the First Addendum.

**C. The Closed Account and the Payments Epstein Would Not Accept**

**27. On December 27, 2023, the Michigan City Department of Water Works wrote to "James Epstein, PMB 808, 1200 4th Street, Key West, FL 33040" concerning the water account for the property at 3609 E. Hwy 12, account no. 15334-001. The letter is captioned "Returned ACH for Account Closed" and states: "Your bank returned an ACH in the amount of $33.19 on December 21, 2023 for reason stated above," and further: "we removed you from ACH due to account being closed." The water utility for the leased commercial property was carried in James Epstein's individual name and billed to his personal address in Florida.**

28. Beginning in January 2024 Epstein asked Plaintiff to make rental payments to him individually rather than to the named Lessor. Epstein told Plaintiff that the reason he wanted the rental checks made out to himself was that Lake Front Associates LLC had no checking account. On January 25, 2024 Epstein wrote to Plaintiff, "hold rent don't mail." On February 8, 2024 he wrote, "did you hold check until i get there." Plaintiff's bank had already issued and mailed the instrument on schedule, as the bank records show, and it could not be stopped; Plaintiff so advised Epstein. Epstein arrived as scheduled in early February 2024 and asked Plaintiff for an advance, and Plaintiff immediately had a cashier's check issued to him. The parties agreed that the instrument then waiting for Epstein upon his return would be applied to the March 2024 payment. Section 14(c) of the Lease provides that no provision may be amended or added to except by a writing signed by the parties, and no such writing was ever made.

29. At Epstein's request, Plaintiff's rental payments through March 2024 were made payable to James Epstein individually rather than to the named Lessor. The advance Epstein requested in February 2024 was payable to James Epstein individually, and Epstein accepted and negotiated it. The instrument applied by agreement to the March 2024 rent was likewise payable to James Epstein individually and was mailed to Epstein in Florida. Epstein retained it and never negotiated it.

**30. Beginning in April 2024, after Epstein began disregarding the Lease's terms, Plaintiff made all rental payments payable to Lake Front Associates LLC exactly as the Lease named the Lessor. Not one was ever negotiated. The cashier's check dated April 16, 2024 in the amount of $2,200.00, payable to Lake Front Associates, was never negotiated; the May and June payments, likewise payable to Lake Front Associates LLC, were never**

**negotiated. The July payment, transmitted by Zelle to Epstein's personal account, was accepted and deposited the same day.**

31. At the June 10, 2026 damages hearing Epstein testified that "[a]ll rental payments made by Mr. Bricker were deposited and held in the name of Lakefront." That testimony cannot be reconciled with Epstein's own statement to Plaintiff that the LLC had no checking account, with his demand that rental payments be made to him individually, or with the fact that no instrument payable to the LLC was ever negotiated.

**D. The Two Ten-Day Notices and the April 2024 Filing**

32. The Lease established its own default procedure. Under § 11(b), a monetary default arises only where the Tenant's failure to pay continues for ten days after written notice by the Landlord. Under § 14(a), any such notice was required to be sent by certified United States mail. Read together, no monetary default could mature under the Lease unless the Landlord first sent a certified-mail notice and the failure to pay then continued for ten days.

**33. No notice satisfying § 14(a) was ever sent to Plaintiff. Because no certified-mail notice was sent, the ten-day period under § 11(b) never began to run and no default under the Lease ever matured. The same requirement governs the sixty days' written notice the Sale Addendum required. The Lease and its addenda were executed as a single transaction and form one integrated agreement, and § 14(a) governs every notice and demand by the Landlord under that agreement. Nothing short of certified United States mail satisfied it, and Epstein sent nothing by certified mail at any time.**

34. Separately from the Lease's default procedure, a Notice to Quit dated April 10, 2024 was delivered to Plaintiff by the LaPorte County Sheriff on April 17, 2024, demanding that Plaintiff

surrender the premises within ten days of receipt unless Plaintiff cured the alleged nonpayment of rent. That Notice to Quit identified the premises as "210 Freyer Rd. Michigan City, IN 46360" and no other. It stated the ground for possession in a single typed line: "NON PAYMENT OF RENT FOR APRIL 2024." It stated no dollar amount and asserted no claim as to March 2024. It was subscribed "Lakefront Associates, LLC, 3609 E. US Hwy 12, Michigan City, IN 46360." The return of service printed at the foot of the notice was left entirely blank - no server, no manner of service, and no date were ever filled in. Indiana Code § 32-31-1-6 permits a landlord to terminate a lease for nonpayment only "with not less than ten (10) days notice to the tenant," and preserves the tenancy where "the tenant pays the rent in full before the notice period expires." Ten days from delivery on April 17, 2024 would have run through April 27, 2024.

35. Plaintiff did not receive that Notice to Quit from Epstein or from Epstein's counsel. An employee assisting with Plaintiff's relocation, who was also a tenant of Epstein in the adjoining converted apartment, mentioned that Epstein had arranged a surprise for Plaintiff involving the Sheriff. Plaintiff went to the Sheriff's office and obtained a copy of the notice from the clerk there.

**36. Plaintiff went immediately to his bank and verified that the instrument designated for the March 2024 rent had not been presented or paid. Plaintiff tendered payment before the Notice to Quit was delivered. On April 16, 2024, Plaintiff obtained a replacement cashier's check in the amount of $2,200.00, covering March and April 2024, payable to Lake Front Associates, and mailed it, together with a letter asking Epstein to follow the terms of the Lease, by certified mail to Epstein's Key West, Florida address. The envelope was delivered and signed for on or about April 22, 2024. Epstein has since claimed the envelope contained only the letter. That instrument was never negotiated.**

**37. On April 24, 2024, at approximately 9:44 a.m., Plaintiff telephoned Epstein's attorney to arrange resolution that day. The attorney asked to meet the following morning, and Plaintiff agreed. At 11:15 a.m. that same day - roughly ninety minutes after agreeing to meet, and three days before the statutory ten-day period would have run - that attorney filed a Notice of Claim on Epstein's direction, in the name of Lakefront Associates, LLC, stating the claim as "NON-PAYMENT OF RENT for March 2024 and April 2024 in the amount of Two Thousand Two Hundred Dollars" and asking "for a Judgment against Defendant, including an order of possession and in the amount of $2,200.00 and court costs." The Notice of Claim recited that "Receipt for previously tendered Notice to Quit and a copy of the Lease is attached hereto," and the Lease, both addenda, the Sheriff's receipt for the Notice to Quit, and the Notice to Quit itself were filed with it. The eviction complaint thus asserted a claim for March 2024 that Epstein's own Notice to Quit, served fourteen days earlier, had not asserted, and for which Epstein at that moment held an uncashed instrument payable to himself individually.**

38. Plaintiff was prepared and financially able to deliver replacement payment at the agreed meeting. The filing foreclosed that opportunity. Epstein already held a sixty-day cancellation right exercisable for any reason and did not use it, because terminating on that ground would have obliged him under the Sale Addendum to stop charging rent and to return Plaintiff's prepaid rental upon the anticipated sale. A successful nonpayment eviction would let him assert that there was no prepaid rental to return, and would convert him from a party owing a refund into a party claiming attorney fees.

39. On May 31, 2024, counsel for the LLC sent Plaintiff a letter asserting that a fee of $10,000.00 per month would be charged for unauthorized storage of Plaintiff's property

beginning June 1, 2024. No provision of the Lease or of any addendum authorized any such charge. In subsequent written notices Epstein asserted storage charges at three mutually irreconcilable rates - $10,000.00 per month, $2.00 per square foot per month, and $50.00 per square foot - and invoked Indiana Code § 32-31-5-6, a provision governing residential tenancies, as authority against Plaintiff's commercial tenancy.

**E. The Lockout of 208 Freyer Road**

40. On July 29, 2024, Epstein as seller executed a renewed written purchase agreement with Rosario Scalise, LLC contemplating a closing on or before September 30, 2024. A paragraph of that agreement conditioned closing on removal of the tenant. Plaintiff does not sue that buyer and does not ask this Court to adjudicate that buyer's contract rights. That agreement and the litigation that followed it are identified as context for motive and timing.

41. Rosario Scalise, LLC was ready, willing, and able to close on or before September 30, 2024. Epstein refused to close. Rosario Scalise, LLC thereafter filed a Verified Complaint for Specific Performance against Epstein, and a lis pendens was recorded against the Property on or about October 28, 2024. Epstein did not convey the Property to that buyer. He conveyed it instead on January 21, 2025 to a different purchaser, at a higher price and on as-is terms.

**42. A purchaser taking the Property as-is had no need for the buildings to be cleared of Plaintiff's inventory. From the time that higher as-is offer was received, Epstein's continued exclusion of Plaintiff from 208 Freyer Road and from its loading docks served Epstein's own financial interest and was not required by any court order or by any term of the Lease. The failure of the earlier sale was caused by Epstein's own refusal to close, as the**

**specific-performance action against him establishes, and not by any act or omission of Plaintiff.**

43. On or about July 31 and August 1, 2024, Plaintiff was excluded from the Property while mid-move. Three semi-trailers had been loaded; five or more remained to be filled. Plaintiff's entire commercial inventory was inside.

**44. No court order of any kind reached 208 Freyer Road at that time. The order entered July 22, 2024 in the state eviction proceeding directed Plaintiff to vacate "the subject premises of 210 Freyer Road" only. It did not mention 208 Freyer Road, notwithstanding that the same order recited the existence of the Second Addendum leasing additional space to Plaintiff. That order expired by its own terms thirty days after entry. No order requiring Plaintiff to vacate 208 Freyer Road was entered by any court until June 6, 2025 - more than ten months after Epstein excluded Plaintiff from that building.**

**45. The LaPorte County Sheriff was present to execute the possession order and declined to remove Plaintiff from the second building. On August 1, 2024, counsel for the LLC filed a Motion for Clarification in the state proceeding stating that "the LaPorte County Sheriff will not assist with regard to that portion of the Property identified as 3609 E. Highway 12" - the designation counsel used for the building correctly identified as 208 Freyer Road - and asking that court to supplement its order to reach those premises. No such relief had been granted when, having been told by the officer charged with executing the order that no authority existed as to that building, Epstein changed the locks on it himself.**

46. On the same day, counsel for the LLC filed a separate motion asking the state court for leave to remove Plaintiff's property and store it at Plaintiff's expense, stating that "Plaintiff

currently has a contract for the sale of the property but will not be able to close due to Defendant's failure to remove his property." By asking permission, Epstein acknowledged that he lacked authority to remove Plaintiff's property unilaterally.

47. Removal of Plaintiff's inventory required the loading docks at 208 Freyer Road. Exclusion from that building deprived Plaintiff of the only practical means of removing his goods from either building.

**F. Epstein's Conduct Toward the Inventory and Plaintiff's Business**

48. Plaintiff's inventory consisted of used restaurant and pre-owned medical equipment held for resale in the ordinary course of business - commercial refrigeration, cooking equipment, fixtures, shelving, pallet racking, and thousands of individual items accumulated over fourteen years. Its fair market value at the time of the exclusion exceeded $75,000 and will be established at trial.

49. An interior doorway connects Plaintiff's leased portion of 208 Freyer Road to the adjoining apartment section Epstein controlled. Plaintiff blocked that doorway to secure his inventory. Epstein opened it. Plaintiff secured it again and Epstein opened it again, repeatedly. Epstein then posted a written sign at the doorway directing that it remain open at all times for maintenance. Section 10 of the Lease permitted entry only upon twenty-four hours' notice and gave Epstein no right to require that an interior doorway stand permanently open.

50. On multiple occasions Epstein also left exterior doors to both buildings unsecured, giving unrestricted access to Plaintiff's inventory to a person formerly employed by Plaintiff and to others with no right to be present. Epstein knew those persons were unsuitable to be given unsupervised access to property of substantial value.

**51. Epstein caused to be prepared and transmitted written communications announcing that Plaintiff's commercial equipment would be given away to the public at no cost. On October 9, 2024, after Plaintiff advised him that the exterior doors were standing open, Epstein wrote: "Your responsible to pay for your security. Rent is usually the most effective. But your things are fine and secured until the courts allows me to take them to the dump." Approximately six weeks before the lockout Epstein had written to Plaintiff: "we have no interest in your equipment."**

52. Multiple units of commercial beverage equipment containing water-filled holding tanks were trapped inside. Such equipment must be drained and winterized before freezing temperatures or its tanks and internal components will split. Plaintiff was excluded throughout the winter of 2024-2025 and could not winterize any of it. As to units Plaintiff has since examined, tanks and associated components were destroyed by freezing; replacement parts alone exceed $20,000, exclusive of labor and diminished value.

53. During a brief period of access in October 2024, Plaintiff observed that identifiable items were already missing, including several hundred pieces of sterling silver flatware held for resale and for scrap value and measuring scales.

**54. On December 27, 2024, Plaintiff regained limited access to the Property pursuant to an order of the LaPorte Superior Court. Defendants limited that access to the 210 Freyer Road building and did not permit access to the loading docks. Removal of commercial restaurant equipment of the size and weight comprising Plaintiff's inventory requires loading dock access; without it, the access afforded was of no practical use for removing Plaintiff's property. Plaintiff was afforded no access whatsoever to 208 Freyer Road. Twenty-five days later Epstein conveyed the Property with Plaintiff's inventory still inside.**

55. Epstein sent written communications to Plaintiff stating that his residential tenants - individuals employed by Plaintiff - would no longer be permitted to work for Plaintiff, and communicated to those tenants that their continued tenancy was in jeopardy if they continued to perform work for Plaintiff. At least one worker ceased working for Plaintiff as a result.

56. Epstein assumed exclusive physical control of Plaintiff's inventory when he excluded Plaintiff. He never inventoried the property, never photographed it, never logged its condition, never recorded who entered the premises, and never accounted for anything removed. Any imprecision in identifying which items were lost, when, or at whose hand is the direct product of Epstein's own failure to discharge those obligations while holding exclusive control of Plaintiff's goods.

**G. The Sale**

57. On January 21, 2025, Epstein conveyed title to the Property to a third-party purchaser at a price higher than that under the earlier agreement, while Plaintiff's entire commercial inventory remained inside and while a stay order entered in the state proceeding remained in effect. In a subsequent judicial proceeding the purchaser acknowledged that it acquired title from James M. Epstein.

58. Epstein gave no sixty-day written notice under the Sale Addendum, did not cause rental to cease, did not return Plaintiff's prepaid rental, and did not give the purchaser the opportunity to continue the Lease with Plaintiff as the First Addendum required. Epstein has characterized his April 24, 2024 eviction filing as his sixty-day notice. That filing was not written notice sent by certified United States mail as § 14(a) required, and it did not afford sixty days. Epstein is bound by his own characterization that he exercised the sale-based right of termination, and he is liable

for having failed to perform the obligations that right carried. Plaintiff continued to pay into the Court Registry, and did pay, through February 2025 - past the sale.

## IV. NO PRECLUSION; NO REVIEW OF STATE JUDGMENTS; NO DUPLICATION

**59. The state eviction proceeding was heard on the small claims docket. The order entered July 22, 2024 expressly recited that small claims rules applied. Indiana Small Claims Rule 11(F) provides that such a judgment "shall be res judicata only as to the amount involved in the particular action and shall not be considered an adjudication of any fact at issue in any other action or court." No finding of fact made in that proceeding is entitled to preclusive effect here.**

60. Plaintiff filed a counterclaim in that action on July 3, 2024. At the damages hearing held June 10, 2026, Plaintiff moved to dismiss it and the court dismissed it without prejudice. No counterclaim asserted by Plaintiff was adjudicated on its merits and no judgment was entered on any counterclaim.

61. The state proceedings adjudicated possessory rights in real estate. They did not adjudicate title to Plaintiff's goods, did not authorize conversion, and did not award Defendants the inventory. A possession judgment is not a decree of title as to a tenant's chattels.

62. The order entered July 22, 2024 expressly declined to adjudicate the addendum provision governing a future sale, stating that the addendum's treatment of selling the property was not at issue in that case. The obligation to give notice of a sale and return prepaid rental was never litigated or determined in any state forum.

63. That same order did not find that Plaintiff had failed to pay the rent the complaint demanded. It found that neither party had proven by a preponderance of the evidence whether the

disputed payment was received. Possession was awarded on a non-renewal theory, not on the nonpayment allegation that was the stated basis for filing.

**64. A damages proceeding remains pending in LaPorte Superior Court No. 2 under Cause No. 46D02-2404-EV-000564, in which the LLC seeks unpaid rent, utilities, and attorney fees. All further proceedings in that matter, including entry of judgment, are presently suspended by order entered August 4, 2026. Plaintiff does not ask this Court to determine any question pending there and seeks no recovery that would duplicate any amount adjudicated there. Should any sum be awarded to Defendants in that proceeding, Plaintiff will credit it against any recovery here, and any award here shall be reduced accordingly.**

65. Plaintiff's injuries were caused by Defendants' own conduct - principally the self-help exclusion from 208 Freyer Road, as to which no state court entered any order for more than ten months - and not by any state-court judgment. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).

## V. CLAIMS FOR RELIEF

### COUNT I - WRONGFUL EXCLUSION, OUSTER, AND TRESPASS (208 FREYER ROAD)

66. Plaintiff incorporates all preceding paragraphs.

67. By the Second Addendum, Plaintiff held a written contractual right to occupy two sections of 208 Freyer Road and to use the loading docks required to remove his inventory. Epstein demanded and accepted rent for that space throughout the tenancy, including for July 2024. In

the alternative, Plaintiff was in actual, open, and lawful possession of 208 Freyer Road with Epstein's knowledge and acquiescence at all times before the lockout.

68. Section 14(b) of the Lease expressly provided that upon paying rent and performing his covenants Plaintiff would have quiet possession of the Premises for the entire term.

69. On or about July 31 and August 1, 2024, Epstein - without any court order reaching 208 Freyer Road, without the assistance or authorization of the Sheriff, and without any lawful authority - changed the locks and excluded Plaintiff from that building, ousting him from premises he had the right to occupy and trapping his commercial inventory inside.

**70. Epstein is personally liable for that conduct. Indiana Code § 23-18-3-3(a) provides that a member, manager, agent, or employee of a limited liability company "may be personally liable for the person's own acts or omissions." Epstein personally changed the locks and personally directed the exclusion.**

71. Epstein's conduct was deliberate and in knowing disregard of Plaintiff's possessory rights. He had been told by the officer charged with executing the order that no authority existed as to that building, and acted anyway.

72. As a direct and proximate result, Plaintiff was denied access to 208 Freyer Road and its loading docks, was prevented from removing his commercial inventory, and suffered substantial damages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, costs, and all other relief the Court deems just and proper.

## COUNT II - CONVERSION OF COMMERCIAL INVENTORY

73. Plaintiff incorporates all preceding paragraphs.

74. Plaintiff owned the commercial inventory located inside 208 and 210 Freyer Road and was entitled to immediate possession of it.

75. Epstein intentionally and without legal authority exerted unauthorized control over that inventory by excluding Plaintiff from the only practical means of removing it, by retaining control of the premises with the goods inside, and by conveying the Property to a third party with the goods still inside.

76. Epstein further deprived Plaintiff of his property by repeatedly reopening the interior doorway Plaintiff had secured, by posting a written directive that it remain open at all times, by leaving exterior doors unsecured, and by thereby creating and maintaining unrestricted access for persons with no right to be present. Items of Plaintiff's inventory were removed without Plaintiff's knowledge or consent.

77. Epstein's conveyance of the Property on January 21, 2025, with Plaintiff's inventory inside and while a stay order remained in effect, was itself an act of conversion transferring custody of Plaintiff's goods to a third party without authority.

78. Plaintiff does not seek return of specific items. Plaintiff seeks the fair market value of the converted inventory as of the date of the conversion, in an amount to be proven at trial, together with consequential damages including the destruction by freezing of commercial beverage equipment whose replacement parts alone exceed $20,000.

79. Conversion is an intentional tort. Indiana's Comparative Fault Act does not abrogate joint and several liability for intentional torts. To the extent any other person exerted unauthorized control over Plaintiff's property during the period of Plaintiff's exclusion, Epstein and that person are concurrent tortfeasors, and one who knowingly gives substantial assistance to another in the commission of a tort is liable for the resulting harm.

80. Having assumed exclusive control of Plaintiff's property, Epstein owed and breached a duty of reasonable care over it. Epstein is personally liable for his own acts and omissions under Indiana Code § 23-18-3-3(a).

81. Epstein's conduct was deliberate, malicious, and in knowing disregard of Plaintiff's property rights. Punitive damages are warranted.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for the value of the converted inventory, consequential damages, punitive damages, costs, and all other relief the Court deems just and proper.

## COUNT III - FRAUD IN THE INDUCEMENT AND ALTER EGO LIABILITY

82. Plaintiff incorporates all preceding paragraphs.

83. On or about May 18, 2023, Epstein presented to Plaintiff for signature a written commercial lease naming "Lake Front Associates LLC" as Lessor, with an effective date of June 1, 2023. By preparing that document, by naming the LLC as Lessor within it, and by presenting it to Plaintiff for signature, Epstein represented that Lake Front Associates LLC was the owner and lessor of the Property.

84. That representation was false. Record title to the Property was held by James M. Epstein personally. Epstein knew it was false when he made it, because he held the title himself. On January 21, 2025 Epstein conveyed the Property in his individual capacity, and the purchaser acknowledged in a subsequent judicial proceeding that it acquired the Property from Mr. Epstein.

85. Epstein concealed the identity of the true owner throughout the tenancy. Asked under oath on June 10, 2026 whether he had ever told Plaintiff who owned the real estate, Epstein answered, "Why would I do that?" Asked whether he had identified the owner as Lakefront Associates or as himself, he answered, "I don't recall." Epstein held no management contract or other written authority to act for the LLC as to the Property.

86. Independently, Epstein failed to disclose that he had listed the Property for sale with a licensed brokerage at an asking price of $890,000.00, a fact then existing and known to him and not available to Plaintiff, at the time he accepted Plaintiff's prepayment of five months' rent on May 18, 2023.

87. Epstein made these representations and concealments to induce Plaintiff to enter the Lease, to pay rent substantially in advance, and to interpose an entity between himself and liability arising from the tenancy.

88. Plaintiff reasonably and justifiably relied. Plaintiff had no means of knowing the true state of title, and Epstein's refusal to identify the owner foreclosed inquiry. Had Plaintiff known that the named Lessor did not own the Property and that the true owner was the individual across the table, Plaintiff would not have prepaid five months of rent, would not have moved his commercial inventory into the premises, and would not have entered the Lease on the terms presented.

89. The LLC is the alter ego of Epstein. Epstein exercised complete dominion over it; he alone negotiated, executed, and administered the Lease, alone directed all litigation concerning the Property, and alone decided to sell it. He directed rent to himself individually. The utility account for the leased commercial property was carried in his own individual name and billed to his personal Florida address. The LLC's bank account was closed and every payment Plaintiff made payable to the LLC went unnegotiated. As alleged above, Epstein told Plaintiff that the LLC had no checking account, and that was the reason he directed that rental checks be made payable to himself individually. The eviction Epstein directed on April 24, 2024 was accordingly prosecuted in the name of an entity that had no account capable of receiving the very payment the action alleged had not been made. The corporate form may not be used to defeat the Lease, the Sale Addendum, or liability for the conduct alleged here.

90. As a direct and proximate result Plaintiff paid rent in advance that was never returned, was denied the protections a properly constituted landlord-tenant relationship would have afforded, incurred relocation costs exceeding $22,000, and suffered all damages flowing from the fraudulently induced tenancy.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, consequential damages, punitive damages, costs, and all other relief the Court deems just and proper.

## COUNT IV - BREACH OF WRITTEN CONTRACT (LEASE AND SALE ADDENDUM)

91. Plaintiff incorporates all preceding paragraphs.

92. The Lease and its addenda are valid and enforceable written contracts.

**93. At the damages hearing held June 10, 2026, Epstein testified under oath that he filed the April 24, 2024 eviction based on alleged nonpayment "and it was my 60-day notice that the building was sold." The Indiana Court of Appeals likewise concluded that the filing of that lawsuit served as notice terminating the Lease. During the initial twelve-month term of the Lease, the only right of termination available to the Landlord was that contained in the Sale Addendum. By Epstein's own characterization, the notice he gave was a sale-based termination notice - and upon such notice the Sale Addendum required that rental cease as of the date of the notice and that any prepaid rental be returned to Plaintiff.**

94. An accepted offer with customary deposit was received during the initial twelve-month term. The Sale Addendum obligation was thereby triggered. Epstein did not cause rental to cease and returned nothing.

95. Defendants further breached the Lease by: (a) failing to send any notice by certified United States mail as § 14(a) required; (b) failing to afford the ten-day cure period § 11(b) required before a monetary default could mature; (c) excluding Plaintiff from 208 Freyer Road, space the Second Addendum leased to him, in breach of the express covenant of quiet possession in § 14(b); (d) requiring that an interior doorway remain permanently open, in breach of § 10; and (e) failing to give the purchaser the opportunity to continue the Lease with Plaintiff as the First Addendum required.

96. Under § 3(b) rent was payable on the first day of each calendar month, in advance. Every payment Plaintiff made was therefore prepaid rental within the meaning of the Sale Addendum, and Plaintiff ensured each was timely.

97. Plaintiff is entitled to all rental paid in advance during the initial twelve-month term or, in the alternative, all rental paid in advance for periods following the date on which rental should have ceased, in an amount to be established at trial.

**98. Plaintiff performed his obligations or was excused from performance. Defendants prevented performance by directing payment outside the terms of the Lease and then declining to negotiate any instrument payable to the named Lessor. A party may not claim breach where its own conduct made performance in the manner the contract required impossible.**

99. Epstein is liable for these breaches. He was at all times the true party in interest on the landlord side of the Lease, and the LLC served as his alter ego.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for contract damages, prejudgment interest, costs, and all other relief the Court deems just and proper.

## COUNT V - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100. Plaintiff incorporates all preceding paragraphs.

101. Epstein's conduct, viewed in its totality, was extreme and outrageous: he threatened his own residential tenants with the loss of their homes if they continued to perform lawful work for Plaintiff; he repeatedly reopened and then ordered permanently open an interior doorway Plaintiff had secured, eliminating Plaintiff's ability to protect his inventory from persons Epstein knew were unsuitable; he manufactured a nonpayment eviction the state court found he had not proven, filing it approximately two hours after his attorney agreed to meet the following morning and three days before the statutory cure period expired; he excluded Plaintiff mid-move with five

or more trailers still to be loaded, on the same day he had executed a purchase agreement conditioned on Plaintiff's removal; he announced in writing that Plaintiff's equipment would be given away at no cost and that it was held only until he could take it to the dump; and he conveyed the Property with Plaintiff's entire inventory inside while a stay order remained in effect.

102. Each act was intentional. Together they constitute a coordinated course of conduct targeting Plaintiff personally and exceeding all reasonable bounds of decency.

103. As a direct and proximate result Plaintiff suffered severe emotional distress, including anxiety, loss of sleep, and the destruction of a business he had operated for more than fourteen years.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages for emotional distress, punitive damages, costs, and all other relief the Court deems just and proper.

## COUNT VI - TORTIOUS INTERFERENCE WITH BUSINESS AND EMPLOYMENT RELATIONS

104. Plaintiff incorporates all preceding paragraphs.

105. Plaintiff maintained existing employment and business relationships with workers, some of whom were Epstein's residential tenants, who performed services critical to Plaintiff's commercial equipment business and to his ability to move and protect his inventory.

106. Epstein had actual knowledge of those relationships. He sent written communications to Plaintiff stating that his residential tenants would no longer be permitted to work for Plaintiff, and communicated to those tenants that their tenancies were in jeopardy if they continued.

**107. Epstein's conduct was intentional, without justification, and accomplished by independently illegal means. Indiana Code § 35-45-2-1 provides that a person who communicates a threat to another person with the intent that the other person engage in conduct against the other person's will commits intimidation, a criminal offense. Epstein communicated to residential tenants a threat that they would lose their homes if they continued to perform work for Plaintiff, with the intent that they cease that work against their will. Epstein possessed no lawful authority to condition a residential tenant's continued occupancy upon that tenant's choice of employer.**

108. Epstein's interference was deliberately timed to coincide with Plaintiff's most vulnerable period, while Plaintiff was attempting to move his inventory and complete his business transition.

109. As a direct and proximate result Plaintiff lost the services of workers critical to his operations, was impaired in his ability to remove and protect his commercial inventory, suffered lost business income, and sustained damage to his business and employment relationships.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages, costs, and all other relief the Court deems just and proper.

## COUNT VII - INDIANA CRIME VICTIMS RELIEF ACT (IND. CODE § 34-24-3-1)

110. Plaintiff incorporates all preceding paragraphs.

111. By knowingly or intentionally exerting unauthorized control over Plaintiff's commercial inventory, and by knowingly facilitating its removal by unauthorized third parties, Epstein committed criminal conversion and theft within the meaning of Indiana Code §§ 35-43-4-3 and 35-43-4-2.

112. Independently, Epstein committed deception within the meaning of Indiana Code § 35-43-5-3 by knowingly making false or misleading written statements with intent to obtain property from Plaintiff or to cause Plaintiff to act to his detriment, including: (a) written notices asserting a right to charge $10,000.00 per month for storage of Plaintiff's property, a charge having no basis in the Lease, in any addendum, or in any agreement between the parties; (b) written notices asserting storage charges at three mutually irreconcilable rates, demonstrating that no such charge existed; and (c) written notices invoking Indiana Code § 32-31-5-6, a provision governing residential tenancies, as authority against Plaintiff's commercial tenancy.

113. Each of the foregoing is an offense under Indiana Code article 35-43 and is therefore a predicate for recovery under Indiana Code § 34-24-3-1.

114. Plaintiff suffered pecuniary loss as a direct and proximate result and is entitled to three times his actual damages, the costs of this action, and a reasonable attorney's fee.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for three times his actual damages, the costs of this action, a reasonable attorney's fee, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Bricker respectfully requests that the Court enter judgment in his favor and against Defendants James M. Epstein and Lake Front Associates LLC, jointly and severally, as follows:

A. Compensatory damages on all Counts in amounts to be proven at trial, including the fair market value of Plaintiff's converted commercial inventory; prepaid rental due under the Sale Addendum; relocation costs exceeding $22,000; lost business income; and damages for

emotional distress and for interference with Plaintiff's business and employment relationships;

B. Treble damages, the costs of this action, and a reasonable attorney's fee under Indiana Code § 34-24-3-1;

C. Punitive damages on Counts I, II, III, V, and VI;

D. A declaration that Lake Front Associates LLC is the alter ego of James M. Epstein and that Epstein is personally liable for its obligations under the Lease and its addenda;

E. Prejudgment and post-judgment interest as allowed by law;

F. Costs of this action; and

G. Such other and further relief as the Court deems just and proper.

**Plaintiff seeks no award of possession of real estate and no order vacating, modifying, or reviewing any state-court judgment.**

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

John Bricker

John Bricker, Plaintiff pro se

P.O. Box 144

New Buffalo, Michigan 49117

(269) 612-8946

octovent@fastmail.fm

Dated: September 3, 2026

**EXHIBITS**

Exhibit A - Commercial Lease dated June 1, 2023, with First Addendum (Sale Addendum clawback) and Second Addendum (208 Freyer Road)

**CERTIFICATE OF SERVICE**

I certify that on 09/03, 2026, a copy of the foregoing was served upon Defendants in the manner permitted by Fed. R. Civ. P. 5.

John Bricker

John Bricker, Plaintiff pro se